**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**128 IMPORTS, INC., d/b/a 128 MAZDA-OLDS-ISUZU, a Massachusetts Corporation**

      **Plaintiff,**

**vs.**                                                  **CASE NO. 05 10523 NG**

**GENERAL MOTORS CORPORATION,**
**a Delaware Corporation**

      **Defendant.**

_____/

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT GENERAL MOTORS' MOTION TO DISMISS**

CAMPBELL CAMPBELL EDWARDS & CONROY, P.C.

Richard P. Campbell
One Constitution Center
Third Floor
Boston, Massachusetts 02129
Telephone: (617) 241-3000
Facsimile: (617) 241-5115

KIRKLAND & ELLIS, LLP

Mark S. Lillie
Leonid Feller
Michael A. Duffy
Joseph Russell
200 East Randolph Drive
Chicago, IL 60601
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

ATTORNEYS FOR DEFENDANT
GENERAL MOTORS CORPORATION

April 18, 2005

# TABLE OF CONTENTS

Page
No.

Introduction ...................................................................................................................... 1

Statement of Facts .......................................................................................................... 1

I.      THE OLDSMOBILE PHASE-OUT. ........................................................................ 1

II.     THE TFAP PROGRAM. ........................................................................................ 2

III.    PRIOR OLDSMOBILE LITIGATION. ................................................................ 3

Argument ......................................................................................................................... 4

I.      128 IMPORTS' ALLEGATIONS UNDER THE MASSACHUSETTS "DEALER'S BILL OF RIGHTS" (COUNT I) FAIL TO STATE A CLAIM. ................................... 5

      A.    The Massachusetts "Dealer's Bill of Rights" Does Not Prohibit The Discontinuation Of A Line-Make. .......................................................... 5

      B.    Plaintiff Cannot State A Claim Under The Massachusetts "Dealer's Bill of Rights." ........................................................................................ 6

II.     128 IMPORTS' CLAIMS FOR BREACH OF CONTRACT (COUNTS II AND III) FAIL BECAUSE NO CONTRACT PROVISION HAS BEEN BREACHED. ................. 8

      A.    Choice-Of-Law. .................................................................................... 9

      B.    The Term of Agreement(s) Provision. .................................................. 9

      C.    Article 4.1. ............................................................................................ 13

      D.    Articles 6.1 and 6.4.1. ........................................................................... 15

      E.    Article 14.5. .......................................................................................... 16

      F.    128 Imports' Claim For Breach Of The Implied Covenant Of Good Faith And Fair Dealing (Count III) Fails Because Michigan Law Does Not Recognize Such A Claim And Because The Implied Covenant Cannot Be Used To Write New Terms Into A Contract. ......................................... 17

III.    128 IMPORTS' CLAIM FOR UNJUST ENRICHMENT (COUNT IV) SHOULD BE DISMISSED BECAUSE AN EXPRESS CONTRACT GOVERNS THE PARTIES' RELATIONSHIP. ................................................................................. 20

Conclusion ...................................................................................................................... 21

# TABLE OF AUTHORITIES

## Cases

*Autohaus, Inc. v. BMW of North America, Inc.*,
 No. CIV. A. 92-10403-MA, 1993 WL 1503945 (D.Mass. Dec 23, 1993) ............................. 18

*Barber v. SMH (US), Inc.*,
 202 Mich. App. 366, 509 N.W.2d 791 (1993) ......................................................................... 20

*Beddall v. State St. Bank & Trust Co.*,
 137 F.3d 12 (1st Cir.1998) ........................................................................................................ 2

*Belle Isle Grill Corp. v. City of Detroit*,
 256 Mich. App. 463, 666 N.W.2d 271 (2003) ....................................................................... 17

*Bertera Chrysler Plymouth, Inc. v. Chrysler Corp.*,
 992 F.Supp. 64 (D.Mass. 1998) ................................................................................... 9, 14, 18

*Brauer v. Hobbs*,
 151 Mich. App. 769, 391 N.W.2d 482 (Mich. App. 1986) .................................................... 12

*Campbell v. City of Troy*,
 42 Mich. App. 534, 202 N.W.2d 547 (1972) ......................................................................... 20

*Canderm Pharmacal, Ltd. v. Elder Pharm., Inc.*,
 862 F.2d 597 (6th Cir. 1988) .................................................................................................. 12

*Certified Abatement Servs., Inc. v. Department of Mgmt. and Budget*,
 No. 245307, 2004 WL 136835 (Mich.App. Jan 27, 2004) ..................................................... 17

*Clark v. West Shore Hosp.*,
 16 Fed. Appx. 421 (6th Cir. 2001) ........................................................................................ 18

*Cook v. Little Caesar Enterprises, Inc.*,
 210 F.3d 653 (6th Cir. 2000) ................................................................................................ 19

*County Motors, Inc. v. General Motors Corp.*,
 278 F.3d 40 (1st Cir. 2002) ..................................................................................................... 14

*Daniels v. Newton*,
 114 Mass. 530 (1874) .............................................................................................................. 11

*Davidson v. General Motors Corp.*,
 57 Mass.App.Ct. 637, 786 N.E.2d 845 (2003) ................................................................... 9, 18

*Dunkin' Donuts Inc. v. Gav-Stra Donuts, Inc.*,
    139 F.Supp.2d 147 (D.Mass. 2001) ................................................................ 18

*Dunkin' Donuts Inc. v. Panagakos*,
    5 F.Supp.2d 57 (D.Mass. 1998) .................................................................... 18

*F.D.I.C. v. Source One Mortg. Services Corp.*,
    844 F.Supp. 40 n. 7 (D.Mass. 1994) ............................................................. 11

*Fudge v. Penthouse Int'l, Ltd.*,
    840 F.2d 1012 (1st Cir.1988) ......................................................................... 2

*George Lussier Enterprises, Inc. v. Subaru of New England, Inc.*,
    393 F.3d 36 (1st Cir. 2004) ............................................................................ 8

*H.J. Tucker & Assocs., Inc. v. Allied Checker & Eng'g Co.*,
    595 N.W.2d 176, 188 (Mich. Ct. App. 1999) ............................................. 20

*Herman v. Ford Motor Co.*,
    119 Mich. App. 639, 326 N.W.2d 590 (1982) ............................................ 10

*Hettrick Mfg. Co. v. Waxahachie Cotton Mills*,
    1 F.2d 913 (6th Cir. 1924) ............................................................................ 12

*In re Wet-Jet Intern., Inc.*,
    235 B.R. 142 n. 13 (Bkrtcy.D.Mass. 1999) ................................................ 11

*Kingsley Assocs., Inc. v. Moll PlastiCrafters, Inc.*,
    65 F.3d 498 (6th Cir. 1995) ......................................................................... 20

*Martin v. East Lansing Sch. Dist.*,
    193 Mich. App. 166, 483 N.W.2d 656 (1992) ............................................ 20

*Seaboard Sur. Co. v. Town of Greenfield*,
    266 F.Supp.2d 189 (D.Mass. 2003) ............................................................ 11

*Stoddard v. Manufacturers Nat'l Bank*,
    234 Mich. App. 140, 593 N.W.2d 630 (1999) ............................................ 12

*Ulrich v Federal Land Bank of St. Paul*,
    192 Mich. App. 194, 480 N.W.2d 910 (1991) ............................................ 17

*Zarum v. Brass Mill Materials Corp.*,
    334 Mass. 81, 134 N.E.2d 141 (Mass.1956) .............................................. 20

**Statutes**

M.G.L.A. c. 93B, § 1 ............................................................................................................................ 7

M.G.L.A. c. 93B, § 12 .......................................................................................................................... 5

M.G.L.A. c. 93B, § 4(c)(4) .................................................................................................................. 5

M.G.L.A. c. 93B, § 5 ............................................................................................................................ 2

**Other Authorities**

*Corbin on Contracts* § 973 (1951) ...................................................................................................... 11

## Introduction

Plaintiff 128 Imports, Inc., d/b/a 128 Mazda-Olds-Isuzu ("128 Imports") fails to state a claim because, *inter alia*, the Complaint attempts to bring claims based on conduct expressly permitted by statute, attempts to bring claims based on a factual predicate disproved by its own allegations, and attempts to both enjoy the benefits of a contract and to sue on that contract. Each of the Complaint's four counts should be dismissed, pursuant to Fed. R. Civ. P. 12(b)(6).

## Statement of Facts

### I.     THE OLDSMOBILE PHASE-OUT.

According to the Complaint, 128 Imports acquired an Oldsmobile franchise in 1970. (*See* Cmplt. ¶ 4). Since that time, 128 Imports has entered into a series of comprehensive, written contracts with defendant General Motors Corporation ("GM") that expressly define the parties' manufacturer/dealer relationship. (*See* Cmplt. ¶ 10). The latest of these contracts (the "Dealer Agreement," Complaint Ex. B, attached hereto as Ex. 1) was entered into as of November 1, 2000 and expires on October 31, 2005. (*See* Cmplt. ¶ 10). The Oldsmobile Dealer Agreement remains valid and effective today.[1]

On December 12, 2000, GM announced that the Oldsmobile line-make would be phased out over a number of years. (*See* Cmplt. ¶ 6). The announcement stressed that "GM plans to continue to produce and sell current Oldsmobile products until the end of their current model life cycles." (Cmplt. Ex. A, attached hereto as Ex. 2). The letter also emphasized that "Oldsmobile will continue to operate over the next several years and we will provide the kind of service and marketing

---

[1]     The parties' entire agreement is comprised of several distinct but integrated components. The two component agreements related to this case (*i.e.* those containing provisions 128 Imports alleges were breached) are the "Standard Provisions" and the "Dealer Sales and Service Agreement." Both are attached hereto at Exhibit 1.

support that Oldsmobile customers have come to expect." (*Id.*)  Indeed, 128 Imports concedes that since the December 2000 letter, it has continued to operate as an Oldsmobile dealer and continues to do so to this day.  (*See* Cmplt. ¶ 6).

On October 27, 2004, GM issued a 12-month notification letter, advising all Oldsmobile dealers – including 128 Imports – of "General Motors' intent not to renew the Oldsmobile Dealer Sales and Service Agreement currently in effect between 128 Imports, Inc. d.b.a. 128 Mazda-Olds-Isuzu and General Motors upon its expiration on October 31, 2005."  (Ex. 3 hereto).[2]  Thus, while the Massachusetts "Dealer's Bill of Rights" requires only 60 days' advance notice of termination or nonrenewal, GM provided notice a full year before the nonrenewal is scheduled to take place.  *See* M.G.L.A. c. 93B, § 5.

## II.    THE TFAP PROGRAM.

128 Imports also complains about GM's Transition Financial Assistance Package ("TFAP") (*see* Cmplt. ¶ 17), which GM announced just two days after the initial phase-out announcement, on December 14, 2000, as a ***voluntary*** program for dealers and which was "designed to assist Oldsmobile dealers in phasing out their Oldsmobile dealership operations."  (Ex. 4, hereto).[3]

---

[2]    Although 128 Imports fails to attach the October 27, 2004 letter to its Complaint, it incorporates the document by repeated reference and by relying on it to assert its claims against GM. *See, e.g.,* Cmplt. ¶ 7 ("By letter dated October 27, 2004, GM finally notified Plaintiff that its Dealer Sales and Service Agreement, which is set to expire on October 31, 2005, will not be renewed"). The Court therefore may consider the document without converting this motion to dismiss into a motion for summary judgment. *See, e.g., Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 16-17 (1st Cir.1998) (concluding that, where trust agreement was "discussed at length" in the complaint, although not attached, and no challenge was made as to its authenticity, the agreement "effectively merge[d] into the pleadings and the trial court [could] review it in deciding a motion to dismiss"); *Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1015 (1st Cir.1988) ("'when plaintiff fails to introduce a pertinent document as part of his pleading, defendant may introduce the exhibit as part of his motion attacking the pleading'") (quoting 5 C. Wright & A. Miller, Federal Practice & Procedure § 1327 at 762-63 (1990)).

[3]    *See* note 2, *supra*.

2

The TFAP program has been an overwhelming success. "[O]f the approximately 2,800 dealers with Oldsmobile Dealer Agreements [in December 2000], almost 97% have signed voluntary transition agreements with General Motors providing for the transition of the Oldsmobile Dealer Agreement." (Ex. 3). Thus, the remarkable dealer acceptance of the TFAP program belies 128 Imports' claim that the program offers "a fraction of the market value of a viable GM franchise . . . ." (Cmplt. ¶ 17).

By its own choice, 128 Imports remains one of the handful of Oldsmobile dealers that have not executed TFAP documents. While that is unfortunate, 128 Imports' claim that TFAP unfairly values the loss to GM Dealers and that GM refused 128 Imports' request for "special circumstances" consideration under the program does *not* serve as the basis for a cause of action in this Court. (Cmplt. ¶¶ 17, 19). On the contrary, GM undertook the TFAP program voluntarily to assist Oldsmobile dealers in transition planning. 128 Imports can point to no duty, contractual or statutory, requiring GM to offer it *any* transition allowance, much less the particular amount that 128 Imports apparently feels it is entitled to receive. Moreover, 128 Imports can point to no harm flowing to it as a result of the TFAP program, since 128 Imports does not allege damage or detriment arising from the TFAP program itself.

## III.    PRIOR OLDSMOBILE LITIGATION.

Before proceeding, it is important to note that the Court need not consider 128 Imports' claims in a vacuum. There has been a limited number of lawsuits filed nationwide arising from the Oldsmobile phase-out brought by the same lawyers now representing 128 Imports. Approximately twelve of these cases have resulted in comprehensive judicial opinions on motions to dismiss such as this one. These opinions are attached alphabetically at Exhibit 5. *See Alderwood Motors, Inc. v. GM.*, Order, No. C02-2210C, (W.D.Wash. March 14, 2003); *Andrews Oldsmobile Datsun, Inc. v. General Motors Corp.*, Order, No. 6:02-CV-1046-ORL-22 DAB (M.D.Fla. March 27,

2003); *Robert Basil Motors, Inc. v. General Motors Corp.*, Report and Recommendation, No. 03-CV-315A (W.D.N.Y., March 19, 2004); *Beck Motors, Inc. v. General Motors Corporation*, Order, No. Civ 01-3014 (C.D.S.D. March 29, 2002); *Biddulph Arrowhead, LLC v. General Motors Corp.*, Order at 5-6, No. Civ. 02-1914-PHX-EHC (D.Ariz. Feb. 18, 2003); *Crippen Auto Mall, Inc. v. General Motors Corp.*, Opinion on Defendant's Motion for Summary Disposition, No. 02-1107-CZ (Mich. Circ. Ct., May 14, 2003); *Holler Enterprises, Inc. v. General Motors Corp.*, Order, No. 6:04-cv-457-Orl-31KRS (M.D.Fla. July 15, 2004); *Lokey Oldsmobile, Inc. v. General Motors Corp.*, Order On Defendant's Motion To Dismiss, No. 8:03-CV-1512-T-17EAJ (M.D.Fla. Nov. 26, 2003); *Don Nester Chevrolet-Oldsmobile, Inc v. General Motors Corp.*, Order, No. 03-724172 (Circ. Ct. Mich. March 3, 2004); *Bob Robinson Chevrolet-Oldsmobile-Cadillac, Inc. v. General Motors Corp.*, Memorandum Opinion and Order, No. 5:01CV145 (N.D.W.V. June 13, 2003); *Shakopee Chevrolet-Oldsmobile-Pontiac-Geo, Inc. v. General Motors Corp.*, Report and Recommendation, No. 02-CV-4361 DSD/SRN (D.Minn. Oct. 18, 2004); *Sullivan-Parkhill Holdings, Inc. v. General Motors Corp.*, Order, No. 03-2032 (C.D.Ill. Sept. 8, 2003). Each of these cases have dismissed some, or all, of the claims now brought by 128 Imports and are referred to, as appropriate, throughout this brief.

## **Argument**

128 Imports attempts to set forth four separate counts consisting of: statutory claims arising under the Massachusetts "Dealer's Bill of Rights" (Count I); contract claims based on purported breaches of the Dealer Agreement (Counts II and III); and a claim for unjust enrichment (Count IV). As set forth herein, none of the four counts can survive this motion, given both the law and the facts as alleged in the Complaint. The Complaint should therefore be dismissed, with prejudice, pursuant to Fed. R. Civ. P. 12(b)(6).

4

I.    **128 IMPORTS' ALLEGATIONS UNDER THE MASSACHUSETTS "DEALER'S BILL OF RIGHTS" (COUNT I) FAIL TO STATE A CLAIM.**

While citing a litany of provisions under the Massachusetts "Dealer's Bill of Rights", plaintiff's claims under the statute fall into three broad categories: (i) that the discontinuation of the Oldsmobile line-make violated M.G.L.A. c. 93B, § 5; (ii) that as a result of the Oldsmobile phase-out, GM's allocation of new motor vehicles to Oldsmobile dealers was "arbitrary, unfair, and unreasonable," in violation of M.G.L.A. c. 93B, § 4(c)(1); and (iii)  that the administration of the TFAP program somehow violated M.G.L.A. c. 93B, § 4(c)(4) and (c)(11).  (*See* Cmplt ¶ 32).

A.    **The Massachusetts "Dealer's Bill of Rights" Does Not Prohibit The Discontinuation Of A Line-Make.**

Each and every one of plaintiff's claims under the Massachusetts "Dealer's Bill of Rights" fails for the simple and dispositive reason that the conduct complained of – GM's decision to phase-out the Oldsmobile line-make – is not prohibited by the Act.  Pursuant to M.G.L.A. c. 93B, § 12, GM's obligation to renew any dealer is conditional: "*If* a manufacturer or distributor renews its franchise agreements periodically, it shall do so as their contractual periods expire *on terms equally available to all* of its motor vehicle dealers in the commonwealth unless there is good cause to do otherwise." *Id.* (Emphasis added).  Put another way, the statute does *not* impose an obligation on GM to renew all of its dealer agreements in perpetuity.  Rather, all that is required is that GM not discriminate against its dealers by renewing some dealers but not others.

Here, there is no dispute, nor can there be, that GM is discontinuing the sale of the Oldsmobile brand through *all* of its dealers.  Indeed, this is the key fact on which the Complaint is premised.  (*See, e.g.*, Cmplt. ¶ 6 ("In or around late October of 2004, GM informed *all* remaining Oldsmobile dealers that it would not . . . renew any Oldsmobile franchise in 2005 . . . .").

Thus, to state a claim, 128 Imports must allege that GM breached the notification requirements of the "Dealer's Bill of Rights." 128 Imports cannot do so. On the contrary, all that the statute requires is that "a manufacturer . . . send notice to a motor vehicle dealer in writing at least 60 days before the contractual term of its franchise agreement expires when the same will not be renewed stating the specific grounds for the nonrenewal." M.G.L.A. c. 93B, § 5(b).

GM has more than complied with this requirement. On October 27, 2004, more than a year prior to the effective date, GM provided 128 Imports with written notice that the Oldsmobile Dealer Agreement would not be renewed when it expired on October 31, 2005 as a result of the Oldsmobile phase-out. (*See* Ex. 3). Accordingly, plaintiff's Massachusetts "Dealer's Bill of Rights" claim must fail, as a matter of law.

**B.    Plaintiff Cannot State A Claim Under The Massachusetts "Dealer's Bill of Rights."**

As described above, the plain language of the "Dealer's Bill of Rights" does not prohibit the discontinuation of a model line and defeats all of plaintiff's claims. Moreover, plaintiff's statutory claims fail for at least two additional reasons as well.

*First*, pursuant to M.G.L.A. c. 93B, § 4(c)(1), 128 Imports puts forth the claim that, during the course of the phase-out, GM's allocation of new motor vehicles to Oldsmobile dealers was "arbitrary, unfair, and unreasonable" because GM did not also phase-out other GM brands. (Cmplt. ¶ 32(b)). Put another way, plaintiff asserts that GM has discriminated against it *not* with respect to other similarly-situated Oldsmobile dealers but, rather, with respect to dealers of GM's other line-makes: Oldsmobile, Cadillac, Chevrolet, Pontiac, Buick, GMC, Hummer, and Saab.

The statute does not permit such a claim. On the contrary, it expressly defines a motor vehicle dealer as "any person who, in the ordinary course of its business, is engaged in the

business of selling new motor vehicles to consumers or other end users *pursuant to a franchise agreement* . . . ." M.G.L.A. c. 93B, § 1 (emphasis added). Thus, the statute expressly limits a dealer's rights and remedies to the specific line-make it is permitted to sell under the terms of its particular dealer agreement. In turn, 128 Imports' Oldsmobile Dealer Agreement is limited to the Oldsmobile brand and does not bestow on plaintiff any rights with respect to other GM line-makes.

128 Imports' argument of cross-brand discrimination has previously been considered, and rejected, in *Holler Enterprises, Inc. v. General Motors Corp.*, Order at 6-7, No. 6:04-cv-457-Orl-31KRS (M.D.Fla. July 15, 2004) (*see* Def. Mem. Ex. 5), where the court interpreted the Florida dealer statute and held that "a reasonable reading of the statute would address distribution of vehicles among dealers *of the particular line-make*." *Id*. (Emphasis added). The interpretation advanced by plaintiff here was also rejected with respect to the Michigan dealer statute in *Crippen Auto Mall, Inc. v. General Motors Corp.*, Opinion on Defendant's Motion for Summary Disposition at 6, No. 02-1107-CZ (Mich. Circ. Ct., May 14, 2003) (dismissing a claim that GM had discriminated against Oldsmobile dealers by phasing out Oldsmobile rather than another line-make: "[The statute] does not apply to the situation where the manufacturer, importer or distributor has adopted a plan for discontinuing the sale of a *particular* make of vehicles to all dealers" (emphasis added)).

*Second*, 128 Imports contends that the administration of the TFAP program somehow violated M.G.L.A. c. 93B, §§ 4(c)(4) and 4(c)(11). (*See* Cmplt. ¶¶ 33(c), (d)). Not true. On the contrary, M.G.L.A. c. 93B, §§ 4(c)(4) and (11) prohibit two things: (i) a manufacturer's attempt to *coerce* a dealer by threatening the dealer's termination or nonrenewal, and (ii) the use of *coercion* to obtain a release. But, even as alleged in the Complaint, there is no coercive element to the TFAP program.

Rather, as 128 Imports describes, if an Oldsmobile dealer rejects TFAP – something that substantially less than 3 percent of dealers have done at this point (*see* Ex. 3) – the TFAP offer "is withdrawn by GM . . . ." (Cmplt. ¶ 18).  Even if this allegation were true, and it is not, there is simply nothing coercive about GM withdrawing an offer that a dealer has rejected.  *See, e.g., George Lussier Enterprises, Inc. v. Subaru of New England, Inc.*, 393 F.3d 36, 44-45 (1st Cir. 2004) (finding no coercion with respect to new vehicles allotted to dealers where the "dealers are not contractually entitled" to the new vehicles).  Nor does anything in the statute require GM to continue to administer its *voluntary* transition assistance program long after it has been accepted by the vast majority of the Oldsmobile dealer body.  Simply put, although 128 Imports may believe that its TFAP offer would not have compensated it for the loss of the Oldsmobile line-make, its recourse was to reject the offer and pursue its legal remedies, as it has done.  No basis for a claim under the Massachusetts "Dealer's Bill of Rights" is adequately alleged in the Complaint.

## II.    128 IMPORTS' CLAIMS FOR BREACH OF CONTRACT (COUNTS II AND III) FAIL BECAUSE NO CONTRACT PROVISION HAS BEEN BREACHED.

A claim for breach of contract requires, at a minimum, some allegation that a contract provision has been breached.  *See, e.g., Jacobson v. BH Associates Ltd. Partnership*, No. 222945, 2001 WL 738408, at *1.  Here, 128 Imports alleges the phase-out of the Oldsmobile line-make violates the following provisions of the parties' Dealer Agreement (*see* Ex. 1): (1) the "Term of Agreement(s)" section of the Dealer Sales and Service Agreement; (2) Article 4.1 of the Standard Provisions; (3) Articles 6.1 and 6.4.1 of the Standard Provisions; and (4) Article 14.5 of the Dealer Agreement.  (*See* Cmplt. ¶ 37).  128 Imports also seeks to state a claim for breach of the implied covenant of good faith and fair dealing.  Each is addressed in turn.

A.    **Choice-Of-Law.**

128 Imports concedes that the Dealer Agreement "is construed under Michigan law pursuant to the choice of law provision in the contract." (Cmplt. ¶ 10). In particular, Article 17.12 of the Dealer Agreement provides: "This agreement is governed by the laws of the State of Michigan." (Ex. 1, § 17.12, at 29).

It is worth noting, however, that despite the parties' expressed intent, the Massachusetts "Dealer's Bill of Rights" appears to require the application of Massachusetts law to plaintiff's claims. In particular, Section 15(e) of the Act provides, "the laws of the commonwealth shall govern the interpretation of the franchise agreement of a motor vehicle dealer located in the commonwealth and the performance of the parties thereunder." M.G.L.A. c. 93B, § 15(e).

Despite this, however, both state and federal courts sitting in Massachusetts have regularly honored choice-of-law provisions in motor vehicle dealers' franchise agreements and applied the state law chosen by the parties. *See, e.g.*, *Bertera Chrysler Plymouth, Inc. v. Chrysler Corp.*, 992 F.Supp. 64, 72 (D.Mass. 1998) ("the Court's construction of any contract between the parties will be governed by the choice-of-law provision in the dealership agreement that designated Michigan law"); *Davidson v. General Motors Corp.*, 57 Mass.App.Ct. 637, 647, 786 N.E.2d 845, 852 (2003) (applying Michigan law because "[t]he agreement recited that it was governed by Michigan law").

Out of an abundance of caution, therefore, and because the result is the same in any event, GM addresses both Michigan and Massachusetts authority in the discussion that follows.

B.    **The Term of Agreement(s) Provision.**

128 Imports alleges that GM breached the "Term of Agreement(s)" section of the Dealer Sales and Service Agreement. (Cmplt. ¶ 38). That section provides:

> This Agreement(s) shall expire on October 31, 2005 or ninety days after the death or incapacity of a Dealer Operator, whichever occurs first, unless earlier terminated. Dealer is assured of an opportunity to enter into a new Agreement(s) ***at the expiration date*** if General Motors determines that Dealer has fulfilled its obligations under this agreement.

(Ex. 1 (Dealer Sales and Service Agreement), at First: Term of Agreement(s) (emphasis added)). 128 Imports' claim that GM breached this provision by failing to renew 128 Imports' Dealer Agreement fails as a matter of law.

The Term of Agreement(s) section that 128 Imports relies upon provides that "Dealer is assured of an opportunity to enter into a new Agreement(s) at the ***expiration date*** " of the current agreement. (*Id.* (emphasis added)). The current agreement does not expire until October 31, 2005. (*See id.*). "A cause of action based in contract arising out of a breach of duty accrues at the time of the actual act of omission." *Herman v. Ford Motor Co.*, 119 Mich. App. 639, 645, 326 N.W.2d 590, 593 (1982) (citation omitted)). Under the renewal provision, GM owes no obligation to 128 Imports (if at all) until after the current agreement expires on October 31, 2005. As a result, 128 Imports' claim for breach of the renewal provision would arise, if at all, only on November 1, 2005.[4]

Thus, at most, 128 Imports could attempt to state a claim for ***anticipatory*** breach of the renewal provision. (*See, e.g.*, Cmplt. ¶ 38 ("GM's October 2004 letter constitutes a complete repudiation of GM's obligations under the renewal provisions . . . .")). Massachusetts, however,

---

[4]    It is worth noting in this regard that, by the plain terms of the renewal provision, 128 Imports' right to be offered a renewal is conditional: "Dealer is assured of an opportunity to enter into a new Agreement(s) at the expiration date ***if General Motors determines that Dealer has fulfilled its obligations under this agreement.***" (Ex. 1 (Dealer Sales and Service Agreement) at First: Term of Agreement(s) (emphasis added)). In this context, that determination could not occur until October 31, 2005. The renewal provision is also conditioned on, among other things, the survival, capacity, and solvency of 128 Imports' dealer-operator. (*See id.*). Again, because the better part of a year remains before the renewal opportunity would have become effective, it is impossible to determine today whether these conditions will be met in the future.

does not recognize the doctrine of anticipatory breach.  *See, e.g.*, *Seaboard Sur. Co. v. Town of Greenfield*, 266 F.Supp.2d 189, 196 (D.Mass. 2003) ("Massachusetts law . . . expressly rejects the doctrine of anticipatory repudiation . . . ."); *F.D.I.C. v. Source One Mortg. Services Corp.*, 844 F.Supp. 40, 43 n. 7 (D.Mass. 1994); *In re Wet-Jet Intern., Inc.*, 235 B.R. 142, 153 n. 13 (Bkrtcy.D.Mass. 1999) ("Massachusetts does not recognize the doctrine of anticipatory repudiation. State law requires that the innocent party wait until performance is due before suing for breach"); *Daniels v. Newton*, 114 Mass. 530 (1874).

As to Michigan law, where the doctrine is recognized, plaintiff's claim still fails because a party may not elect to continue a contract, as 128 Imports has done here, and simultaneously sue for anticipatory breach.  *See* 4 Arthur L. Corbin, *Corbin on Contracts* § 973 (1951), p. 905 ("Under the doctrine of repudiation or anticipatory breach, if, before the time of performance, a party to a contract unequivocally declares the intent not to perform, the innocent party has the option to either sue immediately for the breach of contract *or* wait until the time of performance").

Put another way, even assuming GM had committed an anticipatory breach of the renewal provision, 128 Imports would have two options: it could sue immediately for breach of the contract, or it could continue with the contract and wait until GM refuses to perform and bring suit thereafter.  It could not, however, both continue with the contract *and* sue for anticipatory breach:

> [An anticipatory breach] merely gives the injured party the right to end the agreement; the injured party can choose between canceling the contract and continuing it. . . . If he decides to close the contract and so conducts himself, both parties are relieved of their further obligations and the injured party is entitled to damages. . . . If he elects instead to continue the contract, the obligations of both parties remain in force.  This circuit has followed this rule for many years.

11

*Canderm Pharmacal, Ltd. v. Elder Pharm., Inc.*, 862 F.2d 597, 603 (6th Cir. 1988) (internal quotations and citations omitted); *see also Hettrick Mfg. Co. v. Waxahachie Cotton Mills*, 1 F.2d 913, 919 (6th Cir. 1924) ("[I]n order to enable the [Plaintiff] to sue on such an anticipatory breach, he must accept it as such, and consider the contract at an end. If he elects to consider the contract still in force, he cannot recover. . . ." (citation omitted)); *Stoddard v. Manufacturers Nat'l Bank*, 234 Mich. App. 140, 163, 593 N.W.2d 630, 640 (1999); *Brauer v. Hobbs*, 151 Mich. App. 769, 776, 391 N.W.2d 482, 485 (Mich. App. 1986).

Here, 128 Imports has chosen to keep the contract alive. To this day, 128 Imports is still selling and servicing Oldsmobile vehicles under the Oldsmobile brand name. 128 Imports can only perform these Oldsmobile dealer operations if, in fact, a valid Dealer Agreement exists between it and GM. Having chosen to continue its contract with GM, 128 Imports' claim for anticipatory breach should be dismissed.

Almost without exception, every prior Oldsmobile phase-out-related decision has reached this conclusion and dismissed anticipatory breach claims based on the renewal provision. *See Andrews*, Order at 7; *Basil*, Report and Recommendation at 13; *Crippen*, Opinion on Defendant's Motion for Summary Disposition at 7; *Holler*, Order at 8; *Lokey*, Order On Defendant's Motion To Dismiss at 5; *Robinson*, Memorandum Opinion and Order at 8-10; *Shakopee*, Report and Recommendation at 8-9; *Sullivan*, Order at 5-6; *but see Alderwood*, Order at 12; *Biddulph*, Order at 3-4. (*See* Ex. 5). 128 Imports' breach of contract claim premised on the renewal provision should be dismissed.

C.    **Article 4.1.**

Next, 128 Imports complains that GM failed to honor a purported obligation "to permit each dealer the opportunity to achieve a reasonable return on investment . . . ." (Cmplt. ¶ 37(2)). 128 Imports' claim misconstrues Article 4.1.

Article 4.1 of the Dealer Agreement, in its entirety, states:

4.1    Dealer Network Planning

Because General Motors distributes its Products through a network of authorized dealers operating from approved locations, those dealers must be appropriate in number, located properly, and have proper facilities to represent and service General Motors products competitively and ***to permit each dealer the opportunity to achieve a reasonable return on investment*** if it fulfills its obligations under its Dealer Agreement. Through such a dealer network, General Motors can maximize the convenience of customers in purchasing Products and having them serviced. As a result, customers, dealers, and General Motors all benefit.

To maximize the effectiveness of its dealer network, General Motors agrees to monitor marketing conditions and strive, to the extent practicable, to have dealers appropriate in number, size and location to achieve the objectives stated above. Such marketing conditions include General Motors sales and registration performance, present and future demographic and economic considerations, competitive dealer networks, the ability of General Motors existing dealers to achieve the objectives stated above, the opportunities available to existing dealers, the alignment of Line-Makes, General Motors dealer network plan, and other appropriate circumstances.

(Ex. 1, § 4.1, at 2) (emphasis added).

128 Imports seizes upon a single sentence fragment from these two paragraphs, claiming that "to permit each dealer the opportunity to achieve a reasonable return on investment" imposes some sort of affirmative obligation upon GM. It does not.

Instead, this preambulary language merely sets forth the necessity of an effective dealer network. If it imposes any obligation, it is not upon GM, but upon 128 Imports itself, the

13

subject of the sentence fragment: the "*dealers* must . . . have proper facilities . . . to permit each dealer the opportunity to achieve a reasonable return on investment." (Ex. 1, § 4.1, at 2 (emphasis added)). By contrast, if Article 4.1 could be said to impose obligations upon GM, those obligations would be found in the first sentence of the second paragraph, indicating that GM will "monitor marketing conditions and strive, to the extent practicable, to have dealers appropriate in number, size and location" so as "to maximize the effectiveness of its dealer network." (*Id.*). But even if this language of aspiration could be said to create a duty to monitor or a duty to organize, nothing in 128 Imports' Complaint asserts that GM failed in those regards.[5] *See Bertera Chrysler Plymouth*, 992 F.Supp. at 72 ("Chrysler made no affirmative promises and, accordingly, broke none").

As with 128 Imports' renewal claim, other Oldsmobile decisions considering this provision have regularly dismissed claims brought under Article 4.1. *See Alderwood*, Order at 10; *Crippen*, Order at 7-9; *Holler*, Order at 9-10; *Sullivan*, Order at 6-7; *but see Andrews*, Order at 7; *Basil*, Report and Recommendation at 11-14; *Biddulph*, Order at 3-4; *Lokey*, Order at 5-6; *Nester*, Order at 2; *Robinson*; Order at 13-14; *Shakopee*, Report and Recommendation at 10-11. (*See* Ex. 5). 128 Imports' claim under Article 4.1 of the Dealer Agreement should be dismissed.

---

[5]    128 Imports will likely point to a First Circuit opinion that, according to the plaintiff, purportedly stands for the proposition that Article 4.1 of the Dealer Agreement requires GM to guarantee each of its dealers a reasonable rate of return. On the contrary, the excerpt from *County Motors, Inc. v. General Motors Corp.*, 278 F.3d 40 (1st Cir. 2002) occurs in the *fact* section of the opinion. Moreover, the First Circuit decided *County Motors* on grounds of mootness and concluded that "[b]ecause we find that County's request for injunctive relief is no longer live, the judgment below is **vacated**, and the case is **remanded** with direction to dismiss the complaint as moot." *Id.*, 278 F.3d at 43 (emphasis in original). Simply put, *County Motors* has no relevance to this case, as other courts have recognized. *See Holler*, Order at 9-10. (Ex. 5).

**D.     Articles 6.1 and 6.4.1.**

128 Imports next attempts to hang its hat on Article 6.1 and Article 6.4.1, alleging that

GM failed to "provide a reasonable quantity and variety of products . . . ." (Cmplt. ¶ 37(1), (3)).  In

pertinent part, Article 6.1 provides:

> General Motors will endeavor to distribute new Motor Vehicles
> ***among*** its dealers in a fair and equitable manner.  Many factors affect
> the availability and distribution of Motor Vehicles to dealers,
> including component availability and available production capacity,
> sales potential in Dealer's Area of Primary Responsibility, varying
> consumer demand, weather and transportation conditions,
> governmental regulations, and other conditions beyond the control of
> General Motors.  General Motors reserves to itself discretion in
> accepting orders and distributing Motor Vehicles, and its judgments
> and decisions are final.

(Ex. 1, § 6.1, at 8) (emphasis added).

The announcement of the eventual phase-out of the Oldsmobile line-make cannot

violate Article 6.1.  Rather, the section speaks to GM's procedures for distributing Oldsmobile

vehicles "***among*** its dealers in a fair and equitable manner."  (*Id.*) (Emphasis added).  Here, the

phase-out announcement applies to all Oldsmobile dealers equally.  There is no claim (nor can there

be) that 128 Imports is being treated differently than any other Oldsmobile dealer with respect to

vehicle distribution during the phase-out.  In other words, because there is no dispute that each

Oldsmobile dealer has been treated equally with respect to the phase-out announcement, there can be

no claim under Article 6.1.

As to Article 6.4.1, because 128 Imports cannot state a claim for breach of contract

under Article 6.1, its claim necessarily also fails under Article 6.4.1.  The latter section requires 128

Imports "to purchase and stock . . . a mix of models and series," and requires GM to provide them,

"***subject to*** Article 6.1."  (Ex. 1, § 6.4.1, at 9 ) (emphasis added).  As a result, having failed to state a

claim premised on Article 6.1, 128 Imports cannot do so under Article 6.4.1.

As with 128 Imports' other contract claims, other Oldsmobile decisions considering Articles 6.1 and 6.4.1 have dismissed claims brought under these provisions. *See Alderwood*, Order at 11, No. C02-2210C, (W.D.Wash. March 14, 2003); *Holler*, Order at 10; *but see Andrews*, Order at 7-8; *Basil*, Report and Recommendation at 11-14; *Biddulph*, Order at 3-4; *Crippen*, Order at 9-10; *Lokey*, Order at 6; *Nester*, Order at 2; *Shakopee*, Report and Recommendation at 11-12; *Sullivan*, Order at 7-8. (*See* Ex. 5). 128 Imports' claim under Articles 6.1 and 6.4.1 of the Dealer Agreement fails as a matter of law.

### E. Article 14.5.

Finally, 128 Imports points to Article 14.5 of the Dealer Agreement. (*See* Cmplt. ¶ 37(4)). Article 14.5 sets out a non-exclusive list of material breaches of the Dealer Agreement (*e.g.* felony conviction, insolvency, failure to conduct customary sales and service operations, etc.) which entitle GM to terminate the Dealer Agreement. (*See* Ex. 1, Standard Provisions, § 14.5, at 20-21). 128 Imports' reliance on this provision is misplaced.

128 Imports' argument appears to be premised on the notion that the ***only*** permissible reasons for which GM may terminate the Dealer Agreement are the material breaches set out in Articles 14.5 of the Dealer Agreement. This is simply not the case. Article 13, for example, sets forth additional breaches that can lead to termination. (*See* Ex. 1, Standard Provisions, § 13, at 18-20). More importantly, Article 14.6 of the Dealer Agreement expressly provides, "The terminating party may select the provision under which it elects to terminate . . . . The terminating party subsequently also may assert ***other grounds*** for termination" (emphasis added)). (Ex. 1, Standard Provisions, § 14.6, at 21).

Finally, the only other courts to consider claims premised on the termination provisions of the Dealer Agreement have dismissed them as a matter of law.  *See Basil*, Order at 13; *Shakopee*, Order at 12-13.  128 Imports' Article 14.5 claim should be dismissed.

**F.**     **128 Imports' Claim For Breach Of The Implied Covenant Of Good Faith And Fair Dealing (Count III) Fails Because Michigan Law Does Not Recognize Such A Claim And Because The Implied Covenant Cannot Be Used To Write New Terms Into A Contract.**

In Count III, 128 Imports sets forth a litany of actions and inactions purportedly taken by GM that breached the implied covenant of good faith and fair dealing. (*See* Cmplt. ¶ 44).  128 Imports cannot state a claim for breach of the implied covenant, for at least two reasons.

*First*, over the past two years, Michigan law has crystallized on whether an implied covenant claim exists in Michigan.  It does not.  Indeed, while it has been clear since at least 1991 that Michigan did not recognize an independent *tort* claim for breach of the implied covenant, *see Ulrich v Federal Land Bank of St. Paul*, 192 Mich. App. 194, 197, 480 N.W.2d 910, 911-12 (1991), some Michigan courts have permitted implied covenant claims to go forward in the context of a plaintiff's claim that the defendant has unfairly exercised its discretion under a contract.  Two recent Michigan appellate court cases have rejected this paradigm, however,  and held that *no* claim for breach of the implied covenant exists in Michigan under *any* circumstances.

First, in *Belle Isle Grill Corp. v. City of Detroit*, 256 Mich. App. 463, 666 N.W.2d 271 (2003), the Michigan Appellate Court generally held, "Michigan *does not recognize* a claim for breach of an implied covenant of good faith and fair dealing . . . ." *Id.*, 256 Mich. App. at 476, 666 N.W.2d at 279.  Then, in *Certified Abatement Servs., Inc. v. Department of Mgmt. and Budget*, No. 245307, 2004 WL 136835, *2 (Mich.App. Jan 27, 2004), the court directly rejected a plaintiff's claim that the defendant had not exercised its discretion under a contract "honestly and in good

17

faith," holding that even if the defendant had discretion under the contract, "'Michigan does not recognize a claim for breach of an implied covenant of good faith and fair dealing.'" *Id.*, 2004 WL 136835, *2 (quoting *Belle Isle Grill Corp.*). Because Michigan apparently no longer recognizes an implied covenant claim, Count IV of 128 Imports' Complaint should be dismissed.

> **Second**, even if an implied covenant claim does still exist in Michigan as a corollary to a breach of contract action, as it does in Massachusetts, the implied covenant can **not** be used, as 128 Imports' Complaint attempts to do, to impose obligations on GM that are greater than those contained in the Dealer Agreement. On the contrary, "[t]he implied covenant of good faith under Michigan law . . . neither overrides nor replaces any express contractual term. It does not provide the basis for a cause of action independent of a valid existing contract. Nor does it require a party to ignore, forego or waive its express contractual rights." *Clark v. West Shore Hosp.*, 16 Fed. Appx. 421, 429 (6th Cir. 2001) (internal quotations and citation omitted); *Jacobson v. BH Associates Ltd. Partnership*, No. 222945, 2001 WL 738408, at *1 (Mich. App., June 29, 2001); *see also Bertera Chrysler Plymouth*, 992 F.Supp. at 73 ("a court cannot imply a covenant of good faith and fair dealing to override or replace express contractual provisions when the express terms of a contract govern the disputed issue"); *Davidson*, 57 Mass.App.Ct. at 647, 786 N.E.2d at 852 ("Under Michigan law, an obligation of good faith does not override express contract terms").[6]

---

[6]    Massachusetts law is the same. *See, e.g., Dunkin' Donuts Inc. v. Gav-Stra Donuts, Inc.*, 139 F.Supp.2d 147, 156 (D.Mass. 2001); *Dunkin' Donuts Inc. v. Panagakos*, 5 F.Supp.2d 57, 64 (D.Mass. 1998) ("The implied covenant of good faith cannot override the express terms of a contract"); *Autohaus, Inc. v. BMW of North America, Inc.*, No. CIV. A. 92-10403-MA, 1993 WL 1503945, *7 (D.Mass. Dec 23, 1993) ("While every contract carries an implied covenant of good faith and fair dealing, the covenant cannot be invoked to override the parties' express undertakings" (internal citations omitted)).

128 Imports alleges that GM breached the implied covenant by: (i) failing to distribute motor vehicles in a fair and equitable manner; (ii) failing to comply with the renewal terms of the Dealer Agreement; (iii) failing to comply with the termination provisions of the Dealer Agreement; and (iv) failing to permit plaintiff to receive a reasonable return on investment. (*See* Cmplt. ¶ 44). Each purported ground for a claim of breach of the implied covenant is expressly addressed in the contract provisions discussed above – the Term of Agreement(s) section and Articles 4.1, 6.1, 6.4.1, and 14.5.[7] Having failed to state a claim under the express terms of the Dealer Agreement, 128 Imports cannot use the implied covenant to impose additional duties (or liability) on GM. *See, e.g., Cook v. Little Caesar Enterprises, Inc.*, 210 F.3d 653, 657 (6th Cir. 2000) (holding that a franchisee could "not employ the implied covenant of good faith and fair dealing to override the express term of the franchise agreements . . . ").

Finally, as with 128 Imports' other contract-based claims, other courts considering Oldsmobile cases have consistently dismissed stand-alone implied covenant claims. *See Alderwood*, Order at 13; *Basil*, Order at 19-20; *Biddulph*, Order at 5-6; *Holler*, Order at 10-11; *Nester*, Order at 3; *Robinson*, Order at 16; *but see Andrews*, Order at 12-13; *Lokey*, Order at 8-9; *Shakopee*, Report

---

[7]    128 Imports also attempts to include its TFAP-related allegations under the rubric of an implied covenant claim, asserting that "GM has acted, operated, and applied the Buy-Out program as a substitute compensation mechanism for and in lieu of Article 15 ('Termination Assistance') of the Sales and Service Agreement." (Cmplt. ¶ 44). The claim is without merit. Indeed, plaintiff offers no facts to support the allegation that TFAP program is being applied as a substitute to the obligations imposed under Article 15, nor could it. On the contrary, Article 15 sets forth GM's duties *after* the Dealer Agreement expires or is terminated. (*See* Ex. 1, § 15.2, at 22). The TFAP program, in contrast, was established as a voluntary program on December 14, 2000, almost five years *before* plaintiff's Dealer Agreement was set to expire by its terms. Further, the terms and conditions of the TFAP program are substantially different than the repurchase obligations imposed by Article 15. Simply put, the TFAP program is wholly separate and apart from the parties' Dealer Agreement and, as a result, cannot be the subject of an implied covenant claim.

and Recommendation at 13-16.  (*See* Ex. 5).  Count V of 128 Imports' Complaint should be dismissed.

### III.    128 IMPORTS' CLAIM FOR UNJUST ENRICHMENT (COUNT IV) SHOULD BE DISMISSED BECAUSE AN EXPRESS CONTRACT GOVERNS THE PARTIES' RELATIONSHIP.

Finally, 128 Imports seeks to state a claim for unjust enrichment. (*See* Cmplt. ¶¶ 47-51).  As a matter of law, however, it is axiomatic that "a contract will be implied only if there is *no* express contract covering the same subject matter."  *See Barber v. SMH (US), Inc.*, 202 Mich. App. 366, 375, 509 N.W.2d 791, 796 (1993) (emphasis added); *see also Martin v. East Lansing Sch. Dist.*, 193 Mich. App. 166, 180, 483 N.W.2d 656, 662 (1992); *Campbell v. City of Troy*, 42 Mich. App. 534, 537, 202 N.W.2d 547, 549 (1972).[8]

Here, 128 Imports' Complaint admits that the plaintiff operates under "a renewed contract . . . ." (Cmplt. ¶ 10).  By its express terms, the Dealer Agreement addresses each of the benefits purportedly bestowed by 128 Imports upon GM.  (*See* Cmplt. ¶ 49).  Whereas an express contract exists governing the parties' relationship, 128 Imports finds its remedy, if any, in contract law and cannot state a claim for unjust enrichment.

Nor can 128 Imports plead unjust enrichment as an alternative theory to its claim for breach of contract.  This is permissible *only* where there is a dispute as to whether an express contract exists covering the terms of alleged enrichment.  *See, e.g., H.J. Tucker & Assocs., Inc. v. Allied Checker & Eng'g Co.*, 595 N.W.2d 176, 188 (Mich. Ct. App. 1999); *see also Kingsley Assocs., Inc. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 506 (6th Cir. 1995).  Here, there is no dispute

---

[8]    Massachusetts law is the same.  *See, e.g., Zarum v. Brass Mill Materials Corp.*, 334 Mass. 81, 134 N.E.2d 141, 143 (Mass.1956) ("The law will not imply a contract where there is an existing express contract covering the same subject matter").

that an express contract exists covering those terms; the Complaint attaches and incorporates that express contract, precluding 128 Imports from pleading unjust enrichment at all.

Finally, other courts rendering Oldsmobile phase-out related decisions have dismissed unjust enrichment claims almost without exception. *See Andrews*, Order at 12; *Basil*, Report and Recommendation at 18-19; *Biddulph*, Order at 5; *Crippen*, Opinion at 12-13; *Holler*, Order at 12-13; *Lokey*, Order at 8; *Nester*, Order at 2; *Shakopee*, Report and Recommendation at 23; *Sullivan*, Order at 9-10; *but see Robinson* Order at 18-20. (*See* Ex. 5). Count IV of the Complaint should be dismissed.

## Conclusion

None of 128 Imports' four counts can succeed under either Michigan or Massachusetts law. Accordingly, defendant General Motors Corporation respectfully requests that the Court dismiss the Complaint with prejudice.

Dated: April 18, 2005

Respectfully submitted,


  /s/   Richard P. Campbell_____

CAMPBELL CAMPBELL EDWARDS &
CONROY, P.C.

Richard P. Campbell
One Constitution Center
Third Floor
Boston, Massachusetts 02129
Telephone:  (617) 241-3000
Facsimile:  (617) 241-5115

KIRKLAND & ELLIS, LLP

Mark S. Lillie
Leonid Feller
Michael A. Duffy
Joseph Russell
200 East Randolph Drive
Chicago, IL  60601
Telephone:  (312) 861-2000
Facsimile:  (312) 861-2200

ATTORNEYS FOR DEFENDANT
GENERAL MOTORS CORPORATION

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of April, 2005, I caused a true and correct copy of this

**MEMORANDUM IN SUPPORT OF DEFENDANT GENERAL MOTORS' MOTION TO**

**DISMISS** to be served upon the following counsel of record via U.S. mail:

        Robert F. McDonald, Jr.
        Glenn Israel
        BERNSTEIN, SHUR, SAWYER & NELSON, P.A.
        100 Middle St., West Tower
        Portland, ME  04104

        W. Douglas Moody
        Richard N. Sox, Jr.
        MYERS & FULLER, P.A.
        2822 Remington Green Cir.
        Tallahassee, FL  32308

                      /s/    Richard P. Campbell
                      Richard P. Campbell

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

## CLERK'S NOTICE

This document can not be scanned due to its size, or the way in which it was bound.

The original is available for viewing in the Clerk's Office.